RECEIVED

MAY 9 - 2014

AT 8:30_____M
WILLIAM T WALSH, CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Joseph E. Irenas |
| | : |
| v. | : Crim. No. 14- 263 |
| | : |
| JOSEPH SIGELMAN | : 18 U.S.C. § 371 (Conspiracy); 15 U.S.C. § |
| | : 78dd-2 (Foreign Corrupt Practices Act); 18 |
| | : U.S.C. § 1956(h) (Conspiracy to Launder |
| | : Money); 18 U.S.C. § 1957 (Transacting in |
| | : Criminal Proceeds); 18 U.S.C. § 2 (Aiding |
| | : and Abetting) |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

### Introduction

1.     The defendant JOSEPH SIGELMAN ("SIGELMAN") was a chief executive officer of PetroTiger, Ltd. ("PetroTiger"), an oil and gas services company. During the course of approximately two years, SIGELMAN and two other officers and executives at PetroTiger – Knut Hammarskjold and Gregory Weisman – and others engaged in a scheme to obtain kick-backs at the expense of their investing partners, and to pay bribes to a foreign official in order to secure approval for a lucrative oil services contract in the Republic of Colombia ("Colombia") on behalf of PetroTiger.

### The Kick-Back Payments

2.     Beginning in or around 2009, SIGELMAN, Hammarskjold, Weisman, and others sought to acquire a company (the "Target Company") from its three owners ("Owner 1," "Owner 2," and "Owner 3"). They obtained funds for the acquisition primarily from two investing

partners (the "Investing Partners"). From in or around June 2009 to in or around February 2010, SIGELMAN, Hammarskjold, and Weisman, and others, engaged in a fraudulent scheme to obtain kick-backs from the owners of the Target Company and hide these kick-back payments from the Investing Partners.

3.    SIGELMAN was responsible for negotiating the terms of the acquisition of the Target Company on behalf of the Investing Partners. In or around June 2009, SIGELMAN negotiated two favorable terms for the owners of the Target Company in exchange for kick-back payments to himself, Hammarskjold, and Weisman – payments that were hidden from the Investing Partners. First, SIGELMAN agreed to allow the owners of the Target Company to retain certain equipment in exchange for an approximately $108,550 kick-back payment to SIGELMAN, Hammarskjold, and Weisman. Second, one of the three owners of the Target Company requested from SIGELMAN that the owners be paid an additional approximately $435,000 in connection with the acquisition of their company. However, the other two owners of the Target Company (the "Complicit Owners") simply wanted to close the deal and were satisfied with the offer price without the additional approximately $435,000. SIGELMAN negotiated the increased purchase price in exchange for the Complicit Owners agreeing to kick back their shares of the approximately $435,000 to SIGELMAN, Hammarskjold, and Weisman.

4.    To conceal the kick-back money, SIGELMAN, Hammarskjold, and Weisman instructed the Complicit Owners to pay the kick-back money into SIGELMAN's bank account in the Philippines, rather than into an account in the United States. Once the money was transferred into SIGELMAN's bank account in the Philippines, SIGELMAN then divided up the money and transferred portions of the money to bank accounts controlled by Hammarskjold and Weisman. SIGELMAN received approximately $239,015, Hammarskjold received approximately

2

$106,592, and Weisman received approximately $51,618.

5.      SIGELMAN, Hammarskjold, and Weisman did not disclose these kick-back payments to the Investing Partners. Therefore, the Investing Partners unwittingly paid a higher price for the Target Company, and were thereby deprived of money and property and the honest services of SIGELMAN, Hammarskjold, and Weisman.

The Bribe Payments

6.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

7.      From in or around December 2009 to in or around December 2010, SIGELMAN, Hammarskjold, and Weisman, on behalf of PetroTiger, attempted to secure an approximately $39.6 million contract with another company, Mansarovar Energy Colombia Ltd., to perform oil related services in Colombia (the "Mansarovar Contract"). Because Colombia's national oil company, Ecopetrol S.A. ("Ecopetrol"), had ultimate authority for approving projects and contracts to perform oil related services in Colombia, SIGELMAN, Hammarskjold, and Weisman were required to obtain approval from Ecopetrol for the Mansarovar Contract.

8.      In order to secure Ecopetrol's approval for the Mansarovar Contract, SIGELMAN, Hammarskjold, and Weisman, together with others, paid bribes to an official (the "Official") employed by Ecopetrol who had the ability to influence the approval process. SIGELMAN, Hammarskjold, Weisman, and others attempted to conceal most of the bribe

3

payments by funneling them through the Official's wife (the "Official's Wife") and falsely claimed in documents that the payments were for "consulting services" that the Official's Wife purportedly performed for PetroTiger. The Official's Wife did not, in fact, perform any such services. SIGELMAN, Hammarskjold, and Weisman, together with others, made at least four transfers for the benefit of the Official totaling approximately $333,500.

9.      SIGELMAN, Hammarskjold, Weisman, and others, were successful in obtaining Ecopetrol's approval and secured the Mansarovar Contract on behalf of PetroTiger. The Mansarovar Contract was valued at approximately $39.6 million.

## Relevant Entities and Individuals

10.     PetroTiger was a British Virgin Islands company with operations in Colombia and offices in New Jersey. PetroTiger was in the business of performing oil and gas related services in, among other places, Colombia.

11.     SIGELMAN was a chief executive officer at PetroTiger. SIGELMAN was a citizen of the United States and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).    SIGELMAN's responsibilities at PetroTiger included: overseeing PetroTiger's operations; obtaining and retaining contracts, including the Mansarovar Contract in Colombia; and negotiating the terms of the Target Company's acquisition.

12.     Hammarskjold, who is named as a co-conspirator, but not as a defendant herein, was the other chief executive officer at PetroTiger. Hammarskjold was a citizen of the United States and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Hammarskjold's responsibilities at PetroTiger included:

4

overseeing PetroTiger's operations and obtaining and retaining contracts, including the Mansarovar Contract.

13.     Weisman, who is named as a co-conspirator, but not as a defendant herein, was an officer and general counsel of PetroTiger. Weisman was a citizen of the United States and a resident of New Jersey. Thus, Weisman was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Weisman worked out of an office in New Jersey. Weisman's responsibilities at PetroTiger included oversight of PetroTiger's bank account in the United States and the authorization of payments from that account.

14.     "Employee A" was a sales person at PetroTiger.

15.     "Employee B" was an engineer at PetroTiger.

16.     The Target Company was an oil services company with operations in Colombia. Prior to in or around 2009, the Target Company was owned by Owner 1, Owner 2, and Owner 3. Owner 2 and Owner 3 were the Complicit Owners. In or around 2009, PetroTiger acquired the Target Company for approximately \$53 million.

17.     Owner 1 was a citizen of the United States and one of three owners of the Target Company.

18.     Owner 2 was a citizen of the United States and one of three owners of the Target Company. Owner 2 was the father of Owner 1.

19.     Owner 3 was a citizen of Panama and one of three owners of the Target Company.

20.     "Investing Partner 1" was a citizen of Colombia and a member of the board of directors of PetroTiger. Investing Partner 1, together with Investing Partner 1's company, invested approximately \$20 million to acquire the Target Company.

5

21.     "Investing Partner 2" was a citizen of Colombia and a member of the board of directors of PetroTiger. Investing Partner 2, together with Investing Partner 2's company, invested approximately $15 million to acquire the Target Company.

22.     Ecopetrol was the state-owned and state-controlled petroleum company in Colombia and an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). Ecopetrol was created by national law, and it was required by law that Colombia control, at a minimum, eighty percent of the shares in circulation, with voting rights. During the relevant time period, Colombia controlled approximately 89.9% of Ecopetrol's outstanding capital stock, and held the right to elect the majority of the members of the company's Board of Directors. Ecopetrol's Board of Directors included the Minister of Mines and Energy, the Minister of Finance, and the Director of the National Planning Agency of Colombia. Ecopetrol was responsible for approving contracts to drill or perform services on oil fields in Colombia, including the Mansarovar Contract for which PetroTiger was seeking approval.

23.     The Official was an official at Ecopetrol and had influence over the approval and award of contracts by Ecopetrol, including the Mansarovar Contract. The Official was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

24.     The Official's Wife was the wife of the Official. The Official's Wife purportedly provided finance and management related consulting services for PetroTiger. In reality, the Official's Wife served as a conduit for bribe payments to the Official.

6

## COUNT ONE
(Conspiracy)

25. Paragraphs 1 through 24 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

26. From in or around June 2009 through in or around December 2010, in the District of New Jersey and elsewhere, defendant

### JOSEPH SIGELMAN

did knowingly and intentionally conspire and agree with Hammarskjold, Weisman, Employee A, Employee B, and others known and unknown, to commit offenses against the United States, namely:

     a. to knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and to obtain money and property and deprive the Investing Partners of their right to SIGELMAN's, Hammarskjold's, and Weisman's honest and faithful services by means of false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346; and

     b. being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist SIGELMAN, Hammarskjold, Weisman, and others in obtaining and retaining business for and with, and directing business to, PetroTiger, and others, in violation of Title 15, United States Code, Section 78dd-2(a).

7

## Object of the Conspiracy

27.     The object of the conspiracy was for SIGELMAN, Hammarskjold, and Weisman to secretly and unlawfully use their positions to enrich themselves. They did so in two ways: first, by soliciting and accepting kick-back payments from the Complicit Owners in connection with the acquisition of the Target Company; and second, by making corrupt payments to an official at Ecopetrol to obtain and retain business related to the Mansarovar Contract.

## Manner and Means of the Conspiracy

### *The Kick-Back Payments*

28.     It was part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via electronic mail ("e-mail") obtaining kick-back payments from the Complicit Owners of the Target Company in exchange for providing favorable terms for the benefit of the owners of the Target Company.

29.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail methods of concealing and disguising the kick-back payments, including creating a "side letter" that falsely justified the kick-back payments, and having the payments deposited into SIGELMAN's bank account in the Philippines.

30.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, instructed the Complicit Owners to deposit the kick-back payments into SIGELMAN's bank account in the Philippines.

31.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the way in which SIGELMAN, Hammarskjold, and Weisman would divide and share the kick-back money,

including using the code name "Manila Split" to refer to the distribution of the kick-back payments.

32.      It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the way in which SIGELMAN would transfer to Hammarskjold and Weisman their share of the kick-back money.

33.      It was further part of the conspiracy that SIGELMAN received the kick-back money into his bank account in the Philippines and divided it with Hammarskjold and Weisman.

### The Bribe Payments

34.      It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the need to obtain approval from Ecopetrol for the Mansarovar Contract.

35.      It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail making bribe payments to the Official to assist in obtaining approval from Ecopetrol for the Mansarovar Contract.

36.      It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, offered to pay, promised to pay, and authorized and caused the payment of bribes, directly and indirectly, to and for the benefit of the Official in order to obtain approval from Ecopetrol for the Mansarovar Contract.

37.      It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the manner and means by which the bribe payments were to be paid.

9

38.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, attempted to conceal certain bribe payments to the Official by attempting to make payments through the Official's Wife.

39.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, further attempted to conceal the payments to the Official by creating false justifications for the payments to the Official's Wife, including by approving invoices submitted by the Official's Wife that falsely claimed she performed finance and management consulting services for PetroTiger.

40.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, caused bribe payments to be wired from the bank accounts of PetroTiger to the Official, both directly to the bank account of the Official and indirectly through the bank account of the Official's Wife.

41.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, prevented other members of the board of directors of PetroTiger, including the Investing Partners, from gaining visibility into SIGELMAN's, Hammarskjold's, and Weisman's improper activities, including the bribery scheme.

Overt Acts

42.     In furtherance of the conspiracy and to achieve the unlawful objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

*The Kick-Back Payments*

43.     On or about June 5, 2009, Weisman sent an e-mail to SIGELMAN, stating, "Since we've gone back and forth on this, pls confirm where we ended up regarding the equipment . . . . Sellers [Owner 1, Owner 2, and Owner 3] get it?"

44.     On or about June 5, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 43 above, stating, "Yes, but we get a personal check for $110K that we share pro-rate that does not go to Series A [the Investing Partners]."

45.     On or about June 8, 2009, Weisman sent an e-mail to SIGELMAN, stating, "Please confirm that you want [Owner 2] to sign a side letter regarding the $110k payment."

46.     On or about June 8, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 45 above, stating, "YES!"

47.     On or about June 8, 2009, Weisman responded to the e-mail from SIGELMAN referenced in Paragraph 46 above, stating, "What reason should we put in the side letter for the payment? Also, we'll just say paid at closing as directed by you."

48.     On or about June 8, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 47 above, stating, "Reimbursement for overstated capex? Advisory fees?"

49.     On or about June 8, 2009, Weisman responded to the e-mail from SIGELMAN referenced in Paragraph 48 above, stating, "I think we just call it a fee and be very ambiguous."

50.     On or about June 8, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 49 above, stating, "Reimbursement means no tax, no?"

51.     On or about June 8, 2009, Weisman responded to the e-mail from SIGELMAN referenced in Paragraph 50 above, stating, "Yes, but reimbursement of what? It would have to

11

be a true reimbursement of incurred expenses. Maybe a reimbursement of personally incurred deal expenses that are in excess of the $7M that we got credit for?"

52.     On or about June 8, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 51 above, stating, "How about – we paid them too much for the capex from the $2mm capex note and it was off by 108$?"

53.     On or about August 18, 2009, Owner 2 transferred approximately $108,551 from the bank account of the Target Company to SIGELMAN's Bank of the Philippines bank account in the Philippines.

54.     On or about August 18, 2009, Owner 2 transferred an additional approximately $153,324 from the bank account of the Target Company to SIGELMAN's Bank of the Philippines bank account in the Philippines.

55.     On or about August 25, 2009, SIGELMAN sent an e-mail to Owner 3, copying Weisman and an attorney for the Target Company, stating, "As an FYI, I have not received the wire."

56.     On or about August 26, 2009, Owner 3 transferred approximately $84,372 from a bank account in Panama to SIGELMAN's Bank of the Philippines bank account in the Philippines.

57.     On or about November 10, 2009, Weisman sent an e-mail to SIGELMAN with the subject, "Manila Split," in which Weisman provided SIGELMAN with three options for dividing the kick-back money – total shares that SIGELMAN, Hammarskjold, and Weisman held in PetroTiger, the common share ownership by each, and the incentive share ownership by each – which all resulted in SIGELMAN receiving the largest amount of money, Hammarskjold the second-largest amount of money, and Weisman the least amount of money.

12

58.     On or about November 10, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 57 above, stating, "Total share, why not?", which was the option that resulted in SIGELMAN receiving the most money compared to the other options.

59.     On or about November 10, 2009, SIGELMAN sent an e-mail to Hammarskjold and Weisman with the subject, "Please send me your wire instructions for manila funds."

60.     On or about November 11, 2009, Hammarskjold responded to the e-mail from SIGELMAN referenced in Paragraph 59 above, instructing SIGELMAN to wire approximately $110,000 to his bank account in London and approximately $38,960 to his bank account in the Philippines, which was the amount that Hammarskjold would have been paid under the incentive share ownership option, not the total shares option.

61.     On or about November 11, 2009, Weisman forwarded to SIGELMAN the e-mail from Hammarskjold referenced in Paragraph 60 above, and stated, "Based on the numbers in the below email, I take it that we ended up using the split based on the incentive share percentages (45/37.5/17.5). Is that right?"

62.     On or about November 12, 2009, SIGELMAN responded to the e-mail from Weisman referenced in Paragraph 61 above, stating, "No. The one where I got the most. Knut [Hammarskjold] just sent me this without thinking."

63.     On or about November 26, 2009, SIGELMAN caused a wire transfer in the amount of approximately $106,592.93 from his bank account in the Philippines to a bank account in the United Kingdom for the benefit of Hammarskjold.

64.     On or about January 15, 2010, SIGELMAN caused a wire transfer in the amount of approximately $51,618 from his bank account in the Philippines to a bank account in New Jersey for the benefit of Weisman.

*The Bribe Payments*

65.     On or about December 19, 2009, in response to an e-mail sent by an employee of PetroTiger to SIGELMAN and Hammarskjold listing the Official and a second official from Ecopetrol as having a meeting with Mansarovar, Hammarskjold responded, stating, "I think I me[]t them at the petro show…"

66.     On or about December 20, 2009, Employee A sent an e-mail to himself regarding conversations he had with Ecopetrol officials about the Mansarovar Contract, stating, "If ECP [Ecopetrol] has to intervine [sic]…they have a comitee [sic] to evaluate it. [The Official and another official at Ecopetrol] are part of the comitee [sic], but, they can not Approval theirselves [sic]. They have to include their leader…and other people….ECP people is [sic] ready to help, but, they need to know [where we are in the process]. I will wait instructions."

67.     On or about May 29, 2010, SIGELMAN sent an e-mail to Weisman and Employee A, instructing Employee A to "[p]lease send to Greg [Weisman] the wire instructions for that vendor today," and instructing Weisman to "[p]lease wire immediately."

68.     On or about May 31, 2010, Employee A responded to the e-mail from SIGELMAN referenced in Paragraph 67 above, stating, "I received the info in Colombia for the vendor. Name [the Official's Wife]."

69.     On or about September 14, 2010, around the time that the Official and others at Ecopetrol approved the Mansarovar Contract, SIGELMAN caused approximately $66,700 to be wired from PetroTiger's bank account in Colombia to the Official's bank account in Colombia.

70.     On or about September 28, 2010, at a board meeting of PetroTiger, SIGELMAN stated, in sum and substance, that he and others were dealing with non-transparent commercial practices in Colombia.

14

71.     On or about September 28, 2010, at the board meeting referenced in Paragraph 70 above, in response to a question about whether SIGELMAN was upholding PetroTiger's Code of Business Principles, which included a prohibition on bribery, SIGELMAN stated that he was.

72.     On or about October 7, 2010, Hammarskjold sent an e-mail to Weisman attaching an invoice from the Official's Wife for purported "financial and management services rendered through July 31, 2010," and stated, "This is what need [sic] to go out Friday. I would characterize it as a loan/advance to [PetroTiger's Bogota office] so we can bring it down accounting wise / or reverse it."

73.     On or about October 8, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $133,400 from its bank account in New York to the bank account of the Official's Wife, a transfer that was rejected because the name and the account did not match.

74.     On or about October 12, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $133,400 from its bank account in New York to the bank account of the Official in Colombia.

75.     On or about November 17, 2010, the Official's Wife submitted another invoice to PetroTiger, to the attention of SIGELMAN, essentially identical to the invoice referenced in Paragraph 72 above, except that it was for "financial and management services rendered through August 31, 2010," instead of July.

76.     On or about November 19, 2010, an employee at PetroTiger sent an e-mail to Weisman with the subject, "Invoice [the Official's Wife]," and stated, "Please program for payment. I believe you already know this vendor. As per Joe's [Sigelman's] request, please pay half of it this month and the other half on December."

77.     On or about November 24, 2010, the employee at PetroTiger referenced in Paragraph 76 above forwarded the e-mail referenced in Paragraph 76 above to Weisman, and stated, "Joe [SIGELMAN] asked me yesterday about the half of this payment due before the end of November. Have you being [sic] able to do the payment? Please keep me posted since Joe [SIGELMAN] is asking frequently about this."

78.     On or about December 4, 2010, SIGELMAN forwarded to Weisman an e-mail that was sent to SIGELMAN from the Official's Wife's e-mail account, attaching an invoice dated December 1, 2010, to the attention of SIGELMAN, in the amount of approximately $133,400, providing a different ABA number and Swift number than those provided in the invoice referenced in Paragraph 75 above.

79.     On or about December 6, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.

80.     On or about December 22, 2010, SIGELMAN forwarded to Weisman an e-mail that was sent to SIGELMAN from the Official's Wife's e-mail account that stated, "T[h]anks for the deposite de [sic] two week ago. Please to make the transation [sic] in this week other 50%. The next week I'll give you the first report about XCRM and I'll present you the business plan."

81.     On or about December 23, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official's Wife, a transfer that was rejected because the account was closed.

82.     On or about December 28, 2010, SIGELMAN forwarded to Weisman an e-mail that was sent to SIGELMAN from the Official's Wife's e-mail account that stated, "Excuse me

16

but is necesary [sic] close this invoice before the new year. Please authorize to pay the other 50%."

83.     On or about December 28, 2010, Weisman responded to the e-mail from SIGELMAN referenced in Paragraph 82 above and stated, "Done last week. Pls confirm receipt."

84.     On or about December 28, 2010, SIGELMAN forwarded to the Official's Wife's e-mail account the e-mail from Weisman referenced in Paragraph 83 above, to which a response was received stating, "Don't appear in account [******]1340, please confirm the account."

85.     On or about December 28, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOUR
(Foreign Corrupt Practices Act)

86.     Paragraphs 1 through 24 and 27 through 85 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

87.     On or about the dates set forth below, in the District of New Jersey and elsewhere, defendant

## JOSEPH SIGELMAN,

being a domestic concern, did willfully use the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist SIGELMAN, Hammarskjold, Weisman, and others in obtaining and retaining business for and with, and directing business to PetroTiger and others, as follows:

18

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------------------|----------------------------------------------------------------------|
| Two | October 12, 2010 | Weisman, while in the District of New Jersey and elsewhere, caused a wire transfer in the amount of $133,400 from PetroTiger's bank account in New York to the Official's bank account in Colombia. |
| Three | December 6, 2010 | Weisman, while in the District of New Jersey and elsewhere, caused a wire transfer in the amount of $66,700 from PetroTiger's bank account in New York to the Official's bank account in Colombia. |
| Four | December 28, 2010 | Weisman, while in the District of New Jersey and elsewhere, caused a wire transfer in the amount of $66,700 from PetroTiger's bank account in New York to the Official's bank account in Colombia. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

19

## COUNT FIVE

(Conspiracy to Commit Money Laundering)

88.     Paragraphs 1 through 24 and 27 through 85 of this Indictment are realleged and

incorporated by reference as if fully set forth herein.

89.     From in or around June 2009 through in or around December 2010, in the District

of New Jersey and elsewhere, defendant

### JOSEPH SIGELMAN

did knowingly and willfully conspire and agree with others to commit offenses under Title 18,

United States Code, Sections 1956 and 1957, namely:

a.      to knowingly transport, transmit and transfer monetary instruments and funds from a place outside the United States to a place in the United States and from a place in the United States to a place outside the United States, with the intent to promote the carrying on of a specified unlawful activity, namely, a felony violation of the wire fraud statute, Title 18, United States Code, Sections 1343 and 1346, and a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b.      to knowingly engage in a monetary transaction by, through and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, a felony violation of the wire fraud statute, Title 18, United States Code, Sections 1343 and 1346, in violation of Title 18, United States Code, Section 1957.

20

### Manner and Means of the Conspiracy

90.     It was part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail how SIGELMAN, Hammarskjold, and Weisman would divide and share the kick-back money from the Complicit Owners.

91.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the accounts into which SIGELMAN would transfer Hammarskjold's and Weisman's share of the kick-back money.

92.     It was further part of the conspiracy that SIGELMAN and others caused the transfer of Hammarskjold's and Weisman's share of the kick-back money to bank accounts designated by Hammarskjold and Weisman.

93.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, discussed in person, via telephone, and via e-mail the instructions for sending money to the bank accounts of the Official's Wife and the Official in Colombia for the purpose of promoting the bribe payments to the Official to help secure approval for the Mansarovar Contract.

94.     It was further part of the conspiracy that SIGELMAN, Hammarskjold, and Weisman, and others, directed the wire transfer of, and caused to be wired, money from PetroTiger's bank account in New York to the Official's bank account in Colombia for the purpose of promoting the bribe payments to the Official to help secure approval for the Mansarovar Contract.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT SIX
(Transacting in Criminal Proceeds)

95.     Paragraphs 1 through 24, 27 through 85, and 90 through 94 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

96.     On or about January 15, 2010, in the District of New Jersey and elsewhere, defendant

## JOSEPH SIGELMAN

did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution, affecting interstate and foreign commerce, to wit: the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, in criminally derived property of a value greater than $10,000, that is the transfer of approximately $51,618 from SIGELMAN's bank account in the Philippines to an account designated by Weisman in New Jersey, such property having been derived from specified unlawful activity, namely, a felony violation of the wire fraud statute, Title 18, United States Code, Sections 1343 and 1346.

In violation of Title 18, United States Code, Section 1957 and Section 2.

22

## FIRST FORFEITURE ALLEGATION

1.     The allegations contained in this Indictment are hereby incorporated and realleged by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The United States hereby gives notice to defendant that, upon conviction of any of the offenses alleged in Counts One through Four of this Indictment, the United States will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses.

3.  If by any act or omission of defendant any of the property subject to forfeiture described above:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

## SECOND FORFEITURE ALLEGATION

1.     The allegations contained in this Indictment are hereby incorporated and realleged by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 982(a)(1).

2.     The United States hereby gives notice to the defendant that, upon conviction of any of the offenses alleged in Counts Five or Six of this Indictment, the United States will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in the offense of conviction, and all property traceable to such property.

3.     If by any act or omission of the defendant, any of the property subject to forfeiture described above:

> a.   cannot be located upon the exercise of due diligence;
>
> b.   has been transferred or sold to, or deposited with, a third party;
>
> c.   has been placed beyond the jurisdiction of the court;
>
> d.   has been substantially diminished in value; or
>
> e.   has been commingled with other property which cannot be divided without difficulty;

24

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

A TRUE BILL

PAUL J. FISHMAN
United States Attorney
District of New Jersey

WILLIAM J. STELLMACH
Principal Deputy Chief
U.S. Department of Justice
Criminal Division, Fraud Section

**CASE NUMBER:**  14-263 (JEI)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

**v.**

## JOSEPH SIGELMAN

# INDICTMENT FOR

18 U.S.C. § 371
15 U.S.C. § 78dd-2
18 U.S.C. 1956(h)
18 U.S.C. § 1957

## PAUL J. FISHMAN

*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

DANIEL KAHN
ASSISTANT CHIEF, FRAUDS SECTION
ZACH INTRATER
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2728*

USA-48AD 8
(Ed. 1/97)