

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*
*Appeals Division*

---

*Glenn J. Moramarco*
*Assistant United States Attorney*
Glenn.Moramarco@usdoj.gov

*Federal Building and Courthouse*
*401 Market Street, 4th Floor*
*Camden, NJ 08101-2098*

*Phone: (856)968-4863*
*Fax: (856)968-4917*

June 3, 2015

Hon. Joseph E. Irenas
Mitchell H. Cohen U.S. Courthouse
One John F. Gerry Plaza
Chambers 6030
Camden, NJ 08101

Re:    **United States v. Joseph Sigelman, Crim. No. 14-263**

Dear Judge Irenas,

Pleased accept this as the Government's opposition to Joseph Sigelman's motion to exclude certain testimony of Gregory Weisman, specifically Weisman's anticipated testimony concerning a meeting he had with Mauricio Vesga, which was arranged by the defendant in order to introduce Weisman into the bribery portion of the conspiracy.

We anticipate that Weisman will testify that in mid-2010, while he was in PetroTiger's offices in Colombia, Sigelman instructed Weisman to accompany him to Mauricio Vesga's office. Weisman will testify that Sigelman told him that the purpose of the meeting was that Sigelman wanted Vesga to show Weisman something. When they arrived in Vesga's office, Sigelman stated, in sum and substance, that "this is how we do business in Colombia." Sigelman then left the room, and Weisman proceeded to meet with Vesga for approximately 15 minutes. During this meeting, Vesga showed Weisman a spreadsheet listing payments that PetroTiger made to different individuals or companies in connection with various contracts. Although Weisman does not remember whether Vesga clearly stated, in so many words, that these payments were bribes, Weisman left the meeting with the clear understanding that he had been shown a list of bribe payments made by PetroTiger to get business in Colombia, and that Sigelman had sent him to that meeting for that precise purpose.

Because Weisman was shown a list of bribe payments, and he cannot remember the specific payments he was shown, this testimony has elements that likely constitute "other bad acts" evidence, as well as "intrinsic evidence"

of the crime charged. The meeting itself is "intrinsic" to the crime charged because Weisman considers this to be a crucial meeting in which he was informed of the method of operation used for the bribery part of the conspiracy, and that Vesga and Sigelman were involved. Weisman will testify that near the time that Sigelman arranged for this meeting between Weisman and Vesga, Sigelman asked Weisman to make the first illegal payment to Navarro. The closeness in time between the Vesga meeting, which was arranged by Sigelman, and Sigelman's request to Weisman to pay a bribe, makes the Vesga meeting important evidence that is intrinsic to proving the crime charged. This was the meeting in which Weisman learned of the existence of the conspiracy through two of its key players – Sigelman and unindicted coconspirator Vesga – and it shows the relationship among the conspirators as well as their use of bribery as a means to further the conspiracy.

The main thrust of Sigelman's motion to exclude this testimony is his assertion that "Weisman barely remembers these events." That is simply not the case, although the Government agrees that it is appropriate to hold a Rule 104 hearing to determine precisely what Weisman can and cannot recall about the meeting. What Weisman remembers, and what has not changed, is that Sigelman led him to a meeting with Vesga, and the purpose of that meeting was to make sure that Weisman understood that PetroTiger was paying bribes in order to obtain business in Colombia. Weisman remembers this meeting as the meeting in which he was introduced into the conspiracy, and the meeting was set up by Sigelman and conducted by Vesga.

Sigelman focuses on changes in Weisman's recollection of particular details of the meeting. However, a witness' lack of memory about details of a meeting that occurred five years earlier is not a proper basis for excluding that testimony. Lack of recall of specifics will no doubt go to the weight of the evidence, but it should not, except in extreme cases, be a bar to admissibility. It is not at all surprising that a witness will remember, as Weisman does here, the gist of a meeting that occurred five years ago, rather than all of most of the particulars. Indeed, it would be shocking if Weisman could recall from memory particular bribe payments he was shown five years ago, for a short period of time on a spreadsheet. Weisman recalls what was important to him about that five-year old meeting, which was that Sigelman wanted him to know that PetroTiger was obtaining business through bribes.

Based on Mr. Burck's opening statement, it is clear that evidence of the relationship between Vesga, Sigelman, and Weisman will be important in this case. Mr. Burck argued that Vesga and Hammarskjold were involved in the illegal bribery scheme, and they purposefully excluded Sigelman from all of the relevant emails. Tr. at 118 (06/02/2015). Mr. Burck argued that the conspirators inside PetroTiger, "didn't want Joe to know" about the illegal scheme. *Id.* Weisman's testimony, that Sigelman brought him to meet with Vesga to learn about bribe payments, is important evidence that contradicts

the defense theory of the case, which is that Vesga and Sigelman did not have a relationship in which they shared knowledge of Petrotiger's bribe payments, either with each other or with Weisman.

Weisman's general testimony about the Vesga meeting is both mentioned in and corroborated by the December 15 recording. During that meeting, Weisman reminded Sigelman about "[w]hen you had me go in [Vesga's] office and I sat down with him and he had that spread sheet." Tr. at 55:5-6. Sigelman did not deny that he had set up the meeting or that Vesga had shown Weisman the spread sheet. Rather, Sigelman tried to suggest that the payments on the spread sheet were innocuous because Vesga had "lots of friends" and these people merely "gave him insight into certain deals." Tr. at 55:7-8. Sigelman also insisted that there was "no inside trading" and no "stock picking" related to these company payments to Vesga's "friends." Tr. 55:22 - 56:2. However, Sigelman also asked Weisman, "How many of those [upcoming deals] did we f**king win?," Tr. 56:3-4. A reasonable jury could conclude that, despite Sigelman's general protestations of innocence, he was aware of payments to Vesga's "friends" in connection with upcoming deals that could be won or lost by PetroTiger. *The jury simply will not be able to understand this portion of the December 15 meeting if Weisman is precluded from testifying about his earlier meeting with Vesga and what occurred there.*

Weisman's testimony about the Vesga meeting as his introduction to the bribery scheme is also corroborated by Government Exhibit 91, which contains a short series of emails between Sigelman, Vesga, and Weisman – and only these three. In that series, Sigelman asked Vesga on May 29, 2010, to "Please send to Greg the wire instructions for that vendor today." Vesga in response sent "Greg" (and Sigelman as well) an email listing "Johana Navarro" as the vender, and stated that "Communications around 35 Kbits. Please, let me know how to proceed." This apparently coded reference to "Communications around 35Kbits" is consistent with evidence that Sigelman and Vesga, along with Hammarskjold and Weisman, made bribe payments to Navarro for the benefit of Duran. Further, as the government's evidence shows, and the defendant acknowledges on the video recording, there is no legitimate purpose for a payment to Navarro. The email corroborates that Weisman had been brought into the bribery scheme along with Vesga and Sigelman.

The principal reason that the Government filed a Rule 404(b) notice concerning this evidence is because Weisman cannot recall the specific bribes he was shown on the spreadsheet, and it therefore is very likely (indeed almost certain) that the bribes encompassed more than just the Navarro-Duran bribes charged in the indictment. Indeed, Weisman cannot even say for certain whether the Navarro-Duran bribes were among the particular ones he saw that day. That is unsurprising because, not only was the meeting five years ago, but also, Weisman would not have had reason to focus on the names of

Navarro or Duran at the time, since he had not yet learned about their roles in the conspiracy.

This Court should, of course, conduct a Rule 403 balance to determine whether the prejudicial effect of the testimony substantially outweighs its probative value. The probative value of this evidence is substantial, since Weisman considers this particular meeting to be an important milestone in his induction into the charged conspiracy. There is some potential prejudice from the admission of this evidence, since it suggests that PetroTiger was making other bribe payments beyond the specific ones alleged in the indictment. However, that prejudice does not outweigh the probative value of evidence. Indeed, this Court can instruct the jury that the defendant is not on trial for any other bribes that PetroTiger may or may not made.

Importantly, the prejudice versus probative value balance has changed substantially as a result of Sigelman's opening statement, in which Counsel clearly and unmistakably suggested that the defense case will focus on Sigelman's lack of knowledge of any bribery at PetroTiger and his status instead as a corruption fighter within the company. Thus, defense counsel has opened the door to the Government's presentation of this and other evidence of Sigelman's knowledge of and tolerance of corruption at PetroTiger.[1]

In his opening statement, Mr. Burck argued that Weisman was the mastermind behind the kickback scheme, Hammarskjold was the mastermind behind the bribery scheme, and Sigelman was unaware of and uninvolved in either scheme. Importantly, Mr. Burck emphasized, in the lengthy paragraph that he read in the very first document he showed to the jury, that Sigelman's "expectation is total integrity and forthrightness, all the time," and that "[i]f you are working without integrity or transparency, I guarantee that we will move heaven and earth to prosecute these criminals to the fullest extent of the law." Tr. at 111 (06/02/2015). Similarly, defense counsel has represented to this Court in pretrial hearings that it intends to rely on the December 15 recording to suggest that "Sigelman extensively fought corruption inside PetroTiger." *See* ECF # 193 at page 9 (first bullet point).

In sum, the defense theory of the case is that Sigelman was a corruption fighter who was wrongly fired by his superiors, and the opening statement has placed that contention squarely at issue in this case. Once Sigelman argues, as he already has, that he was a corruption fighter at PetroTiger, the Government cannot in fairness be prohibited from bringing to the jury's attention the evidence that contradicts that assertion. If the jury believes

---

[1] The Government, in its Trial Memorandum, referred to a false invoicing scheme that it anticipated would become relevant either in its direct case or on rebuttal. The false invoicing scheme is precisely the type of evidence that is relevant to rebut Sigelman's "corruption fighter" defense. *See* Memorandum at 6-13.

Weisman's testimony concerning the meeting that Sigelman arranged between Weisman and Vesga, then it is important evidence that disproves part of Sigelman's defense. The jury should have the opportunity to weigh Weisman's testimony, taking into account both what he recalls and what he fails to recall about the Vesga meeting, in making its conclusion about Sigelman's defense theory.

Respectfully submitted,

ANDREW WEISSMANN
Chief
United States Department of Justice
Fraud Section

PAUL J. FISHMAN
United States Attorney
District of New Jersey

By:  /s/ Glenn J. Moramarco

PATRICK STOKES
Deputy Chief

DANIEL S. KAHN
Assistant Chief

TAREK HELOU
Assistant Chief

GLENN J. MORAMARCO
Assistant U. S. Attorney

ZACH INTRATER
Assistant U.S. Attorney